**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**

ASHER COTILLA,

      Plaintiff,

                                               CASE NO. 4:21-CV-000146

v.

                                               **JURY TRIAL DEMANDED**

TAKE 5 OIL CHANGE, LLC;
DRIVEN BRANDS SHARED SERVICES,
LLC; and SUNSHINE CAR CARE, LLC
*individually and d/b/a* "SUPER-LUBE"

      Defendants.

_____/

**COMPLAINT**

Plaintiff Asher Cotilla ("**Plaintiff**" or "**Mr. Cotilla**"), by his undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant TAKE 5 OIL CHANGE, LLC ("**Take 5**"), DRIVEN BRANDS SHARED SERVICES, LLC ("**Driven Brands**"), and SUNSHINE CARE, LLC *individually and d/b/a* "SUPER-LUBE" ("**Super-Lube**"), (collectively referred to as "**Defendants**" or the "**Company**"), and alleges as follows:

**INTRODUCTION**

1.    This employment discrimination case is about an employer who subjected its disabled employee to relentless harassment, discrimination and retaliation to force the employee's resignation in favor of expediating a seamless corporate reorganization.

1

2.     Plaintiff Asher Cotilla brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("**Title VII**"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*.  ("**ADA**"), and the Florida Civil Rights Act of 1992, §760.01, *et seq.*, Florida Statutes ("**FCRA**").

3.     Mr. Cotilla seeks monetary relief to redress Defendants' unlawful employment practices in violation of Title VII, the ADA, and the FCRA.  Additionally, this action seeks to redress Defendants' deprivation of Mr. Cotilla's personal dignity and his civil right to pursue equal employment opportunities.

4.     After almost two years of employment in a workplace largely free of discrimination, Mr. Cotilla found himself at the center of a hostile work environment as part of a scheme orchestrated by Defendants to force Mr. Cotilla to resign under the guise of a lawful termination.

5.     Mr. Cotilla's supervisor incessantly berated Plaintiff for innocuous events, insisted on referring to Mr. Cotilla as "slow," "limited," and told Mr. Cotilla he would suffer consequences if he ever reported the supervisor.  Plaintiff's supervisor also told Mr. Cotilla that he was lucky to even have his job in the first place because the Company's original owner was hesitant to hire Mr. Cotilla given his disabilities and accommodation needs.

6.     Defendants' unrelenting discrimination against Plaintiff culminated with his unlawful termination.  Defendants eliminated Plaintiff's position as "Quality Control Assistance" and, as an illegitimate consolation, offered Mr. Cotilla a role as "Lube Technician," a job Defendants knew Mr. Cotilla's disabilities precluded him from accepting.

7.      At bottom, Defendants are liable for subjecting Mr. Cotilla to a work environment infested with relentless disability discrimination and for wrongfully terminating because of his disabilities.

**PARTIES**

8.      Plaintiff Asher Cotilla is an individual man residing in Gadsden County, Florida.

9.      Defendant Sunshine Car Care, LLC is a limited liability company, and operates its principal place of business at 1311 N. Paul Russell Rd., Tallahassee, FL 32301.

10.      Defendant Driven Brands is a foreign limited liability company duly existing under the laws of Delaware.  Defendant Driven Brands has a principal place of business in Charlotte, North Carolina.  Driven Brands is one of the largest automotive franchisors in the United States, having more than 2,500 locations throughout North America.

11.      Defendant Take 5—acquired by Defendant Driven Brands in 2016—is one of the largest "quick lube" operators in the United States.  Defendant Take 5 brands itself as "Home of the 5-minute oil change."   Defendant Take 5 Oil Change is a limited liability company duly existing under the laws of Louisiana, having its principal place of business at 440 S. Church St., suite 700, Charlotte, North Carolina 28202.

12.      Defendant Super-Lube is a foreign limited liability company duly existing by the virtues and laws of the State of Delaware.  Defendant Take 5 acquired Defendant Super-Lube

13.      At all material times, Defendant Driven Brands, Defendant Take 5, and Defendant Sunshine Car (the "**Company**") were Mr. Cotilla's joint and/or sole employer.

14.      At all relevant times, Defendants, a foreign Corporation, have been continuously doing business in the State of Florida and the City of Tallahassee and has continuously held at least 15 employees for all relevant calendar years. 42 U.S.C. § 12111(5)(A); § 760

3

15.     At all relevant times, Defendants have continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 101(5) of the ADA, 42 U.S.C. § 12115(5) and Section 107(7) of the ADA, 42 U.S.C. § 12117, which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(g) and (h).

16.     Defendants are and have been a covered entity under Section 102(2) of the ADA, 42 U.S.C. § 12111(2).

## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.  This action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(A), which incorporates by reference Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1).

18.     Venue is proper in this Court under 28 U.S.C. §1391 because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Northern District of Florida, Tallahassee Division.

## ADMINISTRATIVE PREREQUISITES

19.     Mr. Cotilla has complied with all administrative prerequisites.

20.     On May 6, 2020, Plaintiff timely dual filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") (Charge No. 511-2020-03215) and the Florida Commission on Human Relations ("FCHR") (Charge No. 2020-25363) against Defendants for unlawful employment practices.

21.     On or about November 3, 2020, the FCHR issue a determination of no reasonable cause.  On January 29, 2021, the EEOC issued a right to sue.

22.     This action is being commenced within 90 days of the EEOC's issuance of Plaintiff's right to sue.

4

23.     Furthermore, this action is being commenced more than one hundred eighty (180) days since the inception of Plaintiff's admirative action against the Defendants.

## FACTS

24.     Mr. Cotilla is a 39-year-old man diagnosed with multiple disabilities.

25.     Plaintiff has both physical and psychiatric disabilities, all of which affect major life activities.

26.     Mr. Cotilla has convergence insufficiency and dyspraxia with tracking issues (a developmental coordination disorder of spatial vision, affecting the planning of movement, depth perception, attention deficits, and eye fatigue), dysgraphia (which affects coordinated vision, causing double vision, affecting manipulative activities such has handwriting and grasping objects), a learning disorder (affecting IQ, evinced by profoundly deficient academic skills), and Attention Deficit Disorder ("ADD") (affecting alertness and focus).

27.     In or around May 17, 2016, Defendant Sunshine Car Care hired Mr. Cotilla as a part time "Quality Control Assistant."  Mr. Cotilla's job duties included recording the turnaround time for cars to come in and out of service.  The Company used Mr. Cotilla's records to monitor the efficiency of their service departments, and to ensure the Company's comportment with their slogans, inter alia, "Home of the 5-minute oil change," and subsequently the "Fastest oil change on the planet."

(1) After approximately six months, the Company offered and subsequently did to increase Mr. Cotilla's hours to full time status.

28.     Mr. Cotilla requested several accommodations to mitigate the adverse effects of his disabilities and to perform the essential functions of his job.

29.     Mr. Cotilla's accommodations included (but were not limited to): breaking up his traditional hour-long lunch in two short breaks (for no more than 15-20 minutes each); a customized spreadsheet to accommodate his handwriting; and a pair of noise-cancelling headphones to limit the distractions when Mr. Cotilla worked in a general office area.  Mr. Cotilla requested the use of noise-cancelling headphones as a direct result of the Company's refusal to relocate Mr. Cotilla's desk to a location with less distractions.

30.     Defendants initially granted Mr. Cotilla's accommodations, but later rescinded them after Plaintiff complained about ongoing disability harassment.

31.     Scott Nelson ("**Mr. Nelson**") is an individual, able-bodied man, who at all material times was employed by Defendants first as its "Quality Control Manager."  Mr. Nelson hired Plaintiff and held direct supervisory authority over Mr. Cotilla, controlling various terms and conditions of Mr. Cotilla's employment.

32.     Aimann Hafez ("**Mr. Hafez**") is an individual, able-bodied man, who is the co-founder of Defendant Super-Lube.  Beginning in or around July 2019, Mr. Cotilla reported directly to Mr. Hafez.  As such, Mr. Hafez held direct supervisory authority over Mr. Cotilla, controlling various terms and conditions of Plaintiff's employment.

33.     Tom Chambasian ("**Mr. Chambasian**") is an individual, able-bodied man, who at all relevant times was employed by Defendants as its "President."  Mr. Chambasian held direct supervisory authority over Mr. Cotilla, controlling various terms and conditions of his employment.

34.     Ashley Barfield ("**Ms. Barfield**") is an individual, able-bodied woman, and at all relevant times was employed by Defendants as its "Accounts Payable and Inventory Manager."

Beginning in or around February 2019, Ms. Barfield held direct supervisory authority over Mr. Cotilla, controlling various terms and conditions of his employment.

35.     Analise (last name unknown) ("**Ms. Analise**") is an individual, able-bodied woman, and at all relevant times was employed by Defendants as its H.R. representative.

36.     Mr. Cotilla appreciated his workplace for the first two years of his employment at the Company.  However, two years into his employment, around the time Defendants initiated corporate reorganization, Mr. Cotilla became the target of unrelenting disability discrimination.

37.     The Company's officers, owners, agents, supervisors and employees subjected Mr. Cotilla to disability discrimination.  Mr. Nelson, Mr. Hafez, Mr. Chambasian, and Ms. Barfield discriminated against and/or harassed Mr. Cotilla because of his disability.

38.     Beginning in or around fall 2016, Mr. Nelson told Mr. Cotilla it was "taking a lot longer to train [him] than other (non-disabled) people."   On another occasion, Mr. Nelson, commented on Mr. Cotilla's handwriting, instructing Plaintiff to make smaller notations on the spreadsheet.  Mr. Cotilla said he could not write any smaller because his dyspraxia affected his handwriting.

39.     While Mr. Cotilla appreciated the initial patience Mr. Nelson showed Plaintiff, Mr. Nelson's discriminatory animus toward Plaintiff increased from being a non-factor all the way to the most aggressive, hostile and unrelenting disability discrimination Mr. Cotilla had ever been subjected to.

40.     Mr. Nelson obsessed over Mr. Cotilla's status as a disabled individual.  Mr. Nelson told Plaintiff that the Company's original owner—and subsequent President, Mr. Chambasian— was reluctant to hire Mr. Cotilla because of his "limitations."  To that end, Mr. Nelson incessantly reminded Mr. Cotilla "how lucky" he was to have a job.  Mr. Nelson said that if it were not for

him, Mr. Cotilla would not even have a job in the first place.  Mr. Nelson then warned Mr. Cotilla that if anything were to happen to his job—meaning, if Mr. Cotilla were to report him, and subsequent discipline occurred—Mr. Nelson said he doubted the Company would keep Mr. Cotilla around.

41.     On one occasion, Mr. Cotilla's co-worker reported him to Mr. Chambasian—the Company's *President*—for using the internet while waiting for service footage to download. Rather than stare at a slow-moving progress bar, Mr. Cotilla browsed the internet for a few moments as he had done several times before over no objection.

42.     In turn, Mr. Chambasian summoned Mr. Cotilla to his office.  Mr. Chambasian sat behind his desk, with a printout of Mr. Cotilla's internet activity in front of him: websites and timestamps documented to the tee.  To be sure, any instance was limited to Mr. Cotilla's internet activity while he waited for the large files to download—hence, no more than a few moments on each occasion.  Mr. Cotilla attempted to explain, but Mr. Chambasian would not give Plaintiff a chance.  Instead, Mr. Chambasian embarked on a tirade, berating and belittling Mr. Cotilla merely for using a computer.  Mr. Chambasian issued Mr. Cotilla a one-day suspension and set him home for the day.  As Mr. Cotilla was leaving the office, Mr. Chambasian shouted, "I don't care if you ever fucking come back!"

## The Transition Period: February – August 2019

43.     In or around early February 2019, Defendants initiated corporate reorganization. On February 7, 2019, the Company entered a Transition Period.  Defendant Take 5 and Defendant Driven Brands agreed to purchase Defendant Sunshine Car Care.  Around this time, Defendants summoned Mr. Cotilla to meet with new Company leadership, including Mr. Hafez, Super-lube's

Co-Founder, and one of Take 5's owners (name unknown) ("**Owner**").  Mr. Nelson was also present.

44.    Mr. Cotilla apprised the Company's new representatives that he was a disabled individual and required various accommodations.   Mr. Cotilla informed Mr. Hafez of his dyspraxia, dysgraphia and explained how it affects his vision, depth perception, handwriting, and ability to manipulate objects—a spiel Mr. Cotilla had grown accustom to giving.  The new owner was understanding of Mr. Cotilla's plight because the owner mentioned his wife taught disabled children.

45.    Company management demanded Mr. Cotilla sign a "Transition Agreement and General Release," providing that Mr. Cotilla's employment with the Sunshine Car Care would cease at the end of the "Transition Period" (February 7, 2019 through August 2, 2019).  Then Mr. Cotilla would report directly to Mr. Hafez.

46.    Indeed, in or around early February of 2019, as the transition period commenced, Defendants began taking measured steps to facilitate an increasingly hostile work environment. On one occasion, while Mr. Nelson and Mr. Cotilla were doing paperwork, Mr. Nelson said, "If it wasn't for me, you wouldn't have a job."  Then, on at least a weekly basis—but more frequently on most occasions—Mr. Nelson would come into Mr. Cotilla's office and call him "slow," insisting he "couldn't dumb it down any further" for Plaintiff.

47.    That was enough.  Mr. Cotilla stood up for himself.  Plaintiff told Mr. Nelson in no uncertain terms that he did not appreciate the discriminatory treatment.  Mr. Cotilla said, "if you fire me there may be legal repercussions since I'm protected because of my disabilities."

48.    Around this time, Mr. Cotilla complained to Ms. Barfield about Mr. Nelson's worsening treatment.  Ms. Barfield supervised both Mr. Cotilla and Mr. Nelson.  After Mr. Cotilla

described the harassment Mr. Nelson subjected him to, Ms. Barfield told Mr. Cotilla she was surprised Plaintiff "hadn't *decked*" Mr. Nelson—meaning, punch him in the face—for the way Mr. Nelson treated Mr. Cotilla.  Nonetheless, Ms. Barfield said she would take care of the matter.

49.     However, nothing changed.  In fact, it only got worse. Indeed, on a weekly basis, Mr. Nelson would enter Mr. Cotilla's office to berate and demean him.  For instance, on one occasion—for no discernable reason—Mr. Nelson entered Mr. Cotilla's office and began screaming uncontrollably.  He would scream things like, "I can't dumb it down any further." Or, "If it wasn't for me, you wouldn't even have this job."  Or, that Defendants "didn't want to hire [Plaintiff] in the first place because of [his] limitations."

50.     Mr. Cotilla found these experiences extremely humiliating.   At least on a weekly basis, Mr. Nelson would enter Mr. Cotilla's office to tell him that he was making mistakes. However, Mr. Nelson never—not once in the almost three years supervising Plaintiff—disciplined Mr. Cotilla in an any official capacity.  Conversely, Mr. Nelson took disciplinary matters into his own hands.  Indeed, Mr. Nelson embarked on these tirades not due any poor job performance—at least not reflected in official records—but instead because of Plaintiff's disability.

51.     Mr. Cotilla could not take it anymore.  Here he was, two years into his employment at the Company, and suddenly he had been subjected to unrelenting disability discrimination.

52.     Mr. Cotilla had to do something because he needed this job.  So, he approached Ms. Barfield again to complain about Mr. Nelson's harassing behavior.  This time, Ms. Barfield had no patience for Plaintiff.  "You two need to learn to get along," she said, "or one of you will have to leave."

53.     Still, it only got ugly from there.  So much so that Mr. Cotilla felt that Mr. Nelson was taking pleasure in reprimanding him.  On one occasion Mr. Cotilla had to leave the office

because he believed Mr. Nelson's discriminatory animus was about to manifest physically.  So, in the face of screaming and unrelenting beratement, Mr. Cotilla decided to walk away to avoid escalating conflict.  However, Mr. Nelson halted Mr. Cotilla, told him that he could not leave and said, "Stop acting like a child!"  Mr. Cotilla stood up for himself.  "I'm not a child," he said.  "I'm a grown man who deserves the same respect as everyone else."

### Defendants orchestrate a scheme to force Plaintiff's resignation

54.    Later, in or around mid-February 2019, Company management informed Mr. Cotilla that Defendants would no longer honor his accommodations.  In addition to the retaliatory and discriminatory nature of this action, Defendants' recission of Plaintiff's accommodations led Mr. Cotilla to believe his job was in grave danger.  That is, without the accommodations, Mr. Cotilla struggled to perform the essential functions of his job because of his eyesight impairments, including his depth perception issues and his ability to write legibly.  Defendants rescinded Mr. Cotilla's accommodations knowing it would force him to resign.

55.    On Friday January 17, 2020, Company management instructed Mr. Cotilla to meet at their office by 5:00 p.m.  Upon his entrance, management curtly informed Mr. Cotilla that his position—"Quality Control Assistant"—was eliminated effective immediately—a position the Company employed to monitor its adherence to their slogan … "Home of the 5-minute oil change."

56.    As a disingenuous consolation, Mr. Hafez offered Mr. Cotilla the alternate role of "Lube Technician"—a job Defendants knew Mr. Cotilla's disabilities precluded him from accepting—with or without reasonable accommodations.[1]  Moreover, this job would require Mr.

---

[1]Indeed, a posting by Take 5 Oil Change on ZipRecruiter.com describes the job duties of a "Lube Technician" as "draining motor oil, changing oil filters, greasing chassis fittings, and performing coolant exchanges."  The posting indicates that qualified employees must "always be alert and aware of [their] surroundings," be capable of "lift[ing] up to fifty (50) pounds," and "[m]ust maneuver in and out of a 3-foot-deep pit" for safe position underneath cars. Additionally, Lube Technicians must be capable of performing essential functions such as, holding, grasping, pulling and turning."

Cotilla to comport with Take 5's building signage: "Fastest Oil Change on the Planet."  Mr. Cotilla simply could not accept the position as Lube Technician.

57.     Defendants told Mr. Cotilla to go collect his things from the office and that he had until Sunday, January 19, 2020 to decide whether he would accept the position of Lube Technician. However, there was no decision for Mr. Cotilla to make.  Mr. Cotilla attempted to explain that he could not do the job—which he was intimately familiar with because he monitored footage—because of his dyspraxia, his motor skills and his eye conditions.   While Ms. Barfield was understanding, Mr. Hafez was not.  Mr. Hafez, the Company's co-founder, insisted Mr. Cotilla call him back over the weekend to report his decision.  Mr. Cotilla agreed even though his mind was already made.

58.     Shortly thereafter, Mr. Cotilla spoke with his father who advised him not to respond to Mr. Hafez since he already told him directly his disabilities precluded him from accepting the job.

59.     Nonetheless, on Sunday January 19, 2020, Mr. Cotilla sent a text message to keep his word in reporting back to Mr. Hafez.  Mr. Hafez redirected Mr. Cotilla to Analise (last name unknown), the Company's H.R. representative ("**Ms. Analise**").

60.     Mr. Cotilla called Ms. Analise and informed her that he had his mother on the phone with him.  Mr. Cotilla explained that he could not accept the Lube Technician job because of disabilities and their effect on his vision and his motor skills.  Ms. Analise insisted, "then the only other option is for you to resign."  Ms. Analise repeated this during the conversation.  She would go back and forth between Mr. Cotilla and his mother.  "So, are you resigning?"  Mr. Cotilla said, "No, my position was terminated."  Ms. Analise insisted, "Ok, you're resigning then, correct?"

61.     Ms. Analise's coercion was getting Mr. Cotilla upset.  Because Plaintiff could not compose himself, Mr. Cotilla told his mother to help him articulate what he had told her his feelings were before the call.

62.     Yet, Plaintiff's mother could only explain what Mr. Cotilla had expressed to Mr. Hafez, Mr. Nelson and Ms. Barfield: Mr. Cotilla could not work in the environment of a Lube Technician because of his various disabilities.

63.     Nonetheless, Plaintiff's mother explained his constructional dyspraxia and lack of depth, and that he could not be around the fumes.  "So," Ms. Analise said, "does that mean you resign?"  Hardly a beat of silence passed.  "Ok, then you resign," she said.  Out of frustration, and against his will, Mr. Cotilla said "Yes."

64.     This pressure tactic was orchestrated by Mr. Hafez, relayed to Ms. Analise, and thereupon carried out on behalf of the Company's year-long effort to discharge Mr. Cotilla in a seemingly legitimate manner.

65.     Mr. Cotilla's mother inquired what would happen to her son's insurance through the Company.  Ms. Analise said that it would end immediately, rather than at the end of the month and promptly hung up after recording Mr. Cotilla's "resignation" in Company records.

66.     Hence, this "offer" was not a genuine offer, but rather a ploy engineered by Defendants as a pretext to masque a workplace permeated with vile disability discrimination. Indeed, Mr. Cotilla's dyspraxia affects his depth perception and his ability to manipulate objects. Moreover, Defendants at no point made any mention of Mr. Cotilla's job performance at the time Mr. Hafez informed Mr. Cotilla that his position was eliminated.  Therefore, the "Lube Technician" offer was not an offer, and instead was offered to insulate Defendants from liability.

67.     To this end, Mr. Hafez insisted that Mr. Cotilla provide his response to Ms. Analise to have a seemingly legitimate resignation reflected in Company records.  However, Mr. Cotilla did not voluntarily resign.  He was coerced into resigning against his will and under pressure at the hands of Ms. Analise—who Mr. Hafez had orchestrated the "Lube Technician" or "resignation" scheme for Ms. Analise to subject Mr. Cotilla to on Sunday January 19, 2020.

68.     Accordingly, Defendants wrongfully terminated Mr. Cotilla by eliminating his position, disingenuously offering him a job Defendants knew Mr. Cotilla could not accept, and by forcing him to submit his resignation under duress.

69.     The aforementioned allegations are just some of the examples of the discrimination Mr. Cotilla suffered.  Additionally, Mr. Cotilla claims a continuous practice of discrimination and continuing violations and makes all claims herein under the continuing violations doctrine.

70.     As a result of the acts and conduct complained of, Mr. Cotilla has suffered and will continue to suffer loss of income, loss of salary, bonuses, benefits, and other compensation which such employment entails.  Mr. Cotilla also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

71.     Mr. Cotilla suffers from increased stress and anxiety.  Similarly, Mr. Cotilla has trouble sleeping as a result of Defendants' conduct.  Mr. Cotilla is unsure of how he will work now given that his employment history includes only working for his father.  Mr. Cotilla is nervous that he will be unable to find work again.  However, Mr. Cotilla is determined to find work and to pursue employment in a workplace that treats disabled individuals with respect.

72.     Further, as a result of Defendants' unlawful employment practices, Mr. Cotilla felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

73.     Defendants' placed Mr. Cotilla in a detrimental situation: Here he was, a thirty-nine-year-old disabled man whose only other substantial employment experience had been working for his father.

74.     Mr. Cotilla's job performance was not the reason he lost his job.  Defendants cited no legitimate reason for terminating Plaintiff.

75.     As Defendants' conduct has been malicious, willful, extreme and outrageous, and with full knowledge of the law, Mr. Cotilla seeks punitive damages.  Mr. Cotilla has presented factual allegations that would permit any reasonable jury to award damages.

76.     At bottom, Defendants are liable for their reckless disregard for Mr. Cotilla's personal dignity and his civil right to pursue equal employment opportunity.

77.     Mr. Cotilla has suffered damages as a result of Defendants' unlawful employment practices.

**COUNT ONE**
*Disability Discrimination (Hostile Work Environment)*
*in Violation of the ADA*
**(Against all Defendants)**

78.     Plaintiff reincorporates the allegations in the previous paragraphs.

79.     Courts recognize disability-based hostile work environment claims under the ADA. *See, e.g.*, *Phillips v. Harbor Venice Mgmt., LLC*, No. 8:19-CV-2379-T-33TGW, *1, *3, 2020 WL 2735201 (M.D. Fla. May 26, 2020) ("the Court will assume that a disability-based hostile work environment claim is actionable under the ADA."); *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1366 (S.D. Fla. 1999) (same).

80.     Plaintiff engaged in protected activity by complaining directly to Mr. Nelson following Mr. Nelson's repeated mistreatment of Plaintiff.  Plaintiff also complained to Ms. Barfield on two occasions.

15

81.     Plaintiff was subjected to unwelcome harassment.  Defendants' Nelson constantly berated, screamed, humiliated, and demeaned Plaintiff on a regular basis because of his disability. Plaintiff told Mr. Nelson to stop.  Plaintiff further complained to Company management about Mr. Nelson's discriminatory animus.

82.     As described throughout this Complaint, Mr. Nelson discriminated against Mr. Cotilla by incessantly referring to Plaintiff as "slow," telling Mr. Cotilla he "couldn't dumb it down any further" and constantly reminded Mr. Cotilla of how lucky he was to have his job given his "limitations."  Additionally, Mr. Nelson warned Mr. Cotilla that should anything happen to Mr. Nelson's employment—meaning termination or discipline as a result of Plaintiff's internal complaint—Mr. Cotilla would lose *his* employment as well.

83.     Finally, this conduct was undoubtedly sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.  In addition to the aforementioned conduct, Mr. Nelson repeatedly subjected Plaintiff to relentless screaming and berating.  Defendants' President, Mr. Chambasian, berated and suspended Plaintiff merely for using a computer.  Mr. Chambasian screamed at Plaintiff, telling him, "I don't care if you ever fucking come back!"

84.     Accordingly, Defendants subjected Plaintiff to a hostile work environment because of his disability.

85.     As a direct and proximate cause of the discrimination facilitated by Defendants, Plaintiff has suffered damages.

86.     Defendants are liable for unlawful disability discrimination under Title I of the ADA.

**COUNT TWO**
***Disability Discrimination (Hostile Work Environment)***
***in Violation of the FCRA §760.10(1)(a)***
**(Against all Defendants)**

87.     Plaintiff reincorporates the allegations contained in the previous paragraphs.

88.     Florida courts recognize disability-based hostile work environment claims under the FCRA.  *See Phillips v. Harbor Venice Management, LLC*, No. 8:19-cv-2379-T-33TGW, 2020 WL 2735201, *1, *3 (M.D. Fla. May 26, 2020).

89.     Plaintiff engaged in protected activity by complaining directly to Mr. Nelson following Mr. Nelson's repeated mistreatment of Plaintiff.  Plaintiff also complained to Ms. Barfield on two occasions.

90.     Defendants subjected Plaintiff to unwelcome harassment, which Plaintiff adamantly opposed.  Mr. Cotilla told Mr. Nelson to stop harassing him.  Mr. Cotilla said that Mr. Nelson's harassment and Plaintiff's termination could make the Company liable because Plaintiff is protected by disability laws.  Plaintiff again complained and opposed Mr. Nelson's conduct by reporting his mistreatment to Ms. Barfield.

91.     Defendants' conduct was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's work environment.  Mr. Nelson insisted on calling Plaintiff "slow," and telling him he could not "dumb it down any further," and that Plaintiff was lucky to even have the job in the first place.  Mr. Nelson threatened Plaintiff, warning him that if Mr. Nelson's employment with Defendants ceased, the new owners would surely terminate Plaintiff.  Mr. Nelson told Plaintiff he was only employed because of Mr. Nelson, and that Defendants' new owners did not want to retain Plaintiff because of his "limitations."   Plaintiff's opposition to this base discrimination evinces the unwelcome quality of Defendants' harassment.

92.     Defendants' conduct was the but for cause of the aforementioned harassment. Indeed, following Mr. Cotilla's complaint, Mr. Nelson would enter Plaintiff's office on a weekly basis to openly berate, belittle and humiliate Plaintiff.  Mr. Nelson would scream uncontrollably,

demanding Mr. Cotilla to stay in his office and "stop acting like a child." Mr. Nelson also would tell Plaintiff he was lucky, given his disabilities, that he even had a job.  To that end, Mr. Nelson insulted Plaintiff by saying the Company's original owners never wanted to hire Plaintiff in the first place *because of* his "limitations."  Mr. Nelson further disparaged Plaintiff, implying he was "too dumb" to acquire a job on his own.

93.     Accordingly, Plaintiff was subjected to severe and/or pervasive disability discrimination from all levels of corporate management.

94.     Defendants are strictly and/or vicariously liable for subjecting Plaintiff to a disability based hostile work environment.

95.     As a direct and proximate result of the unlawful discrimination facilitated by Defendants, Plaintiff has suffered damages.

96.     Defendants are liable for unlawful disability discrimination under the FCRA.

**COUNT THREE**
*Disability Discrimination (Failure to Accommodate)*
*in Violation of the ADA 42 U.S.C. § 12112(a)*
**(Against all Defendants)**

97.     Plaintiff reincorporates the allegations in the previous paragraphs.

98.     Title I of the ADA provides that employers shall not discriminate against qualified individuals on the basis of a disability. 42 U.S.C. § 12112(a).[2]

99.     The ADA obligates employers to provide reasonable accommodations to a qualified disabled individual.  42 U.S.C. § 12112(b)(5)(A)).  Qualified individuals are those who can perform the essential functions of their jobs with or without reasonable accommodations.

---

[2] The ADA defines a disability as a "physical or mental impairment" that "substantially limits" one or more "major life activities."  29 C.F.R. § 1630.2(g)(1).

100.     Plaintiff is a disabled individual because he has a record of, and actually has, disabilities including visual dyspraxia, dysgraphia, ADD, and a learning disability.   These disabilities affect major life activities including vision, depth perception, handwriting, the ability to manipulate objects, and the ability to focus.

101.     Plaintiff requested an accommodation for two short breaks in lieu of an hour-long lunch break.   Both of Plaintiffs short breaks never surpassed a total of forty-five minutes. (Defendants' employees receive an hour-long lunch break per working day). Additionally, Plaintiff requested accommodations for a modified spreadsheet so he could record the service department's efficiency.

102.     Plaintiff is a qualified individual because Plaintiff was fully capable of performing the essential functions of his job with the aforementioned accommodations.  Defendants initially provided Plaintiff with those accommodations but revoked them after Plaintiff complained of ongoing discrimination.

103.     Defendants' Nelson admitted Defendant Sunshine Car Care was reluctant to hire Mr. Cotilla because of his disabilities and accommodation needs.  Although Defendants initially granted Plaintiff's accommodation requests, Defendants rescinded them after Plaintiff complained about discrimination.

104.     Defendants are strictly and/or vicariously liable for discriminating against Plaintiff on the basis of his disability.

105.     Defendants supervisors and agents subjected Plaintiff to a hostile work environment.

106.     Alternatively, Defendants are liable by proxy because Mr. Hafez, the Company's Co-founder, and one of its officers, Mr. Chambasian, the Company's President, facilitated the discrimination by rescinding Plaintiff's accommodations.

107.     As a result of Defendants' failure to accommodate Plaintiff in violation of 42 U.S.C. section 12112(a), Plaintiff has suffered damages.

**COUNT FOUR**
***Disability Discrimination (Failure to Accommodate)***
***in Violation of the FCRA §760.10.***
**(Against all Defendants)**

108.     Plaintiff reincorporates the allegations in the previous paragraphs.

109.     The FCRA imposes a duty to employers to provide reasonable accommodations to qualified disabled individuals.  *Green v. Seminole Elec. Co-op., Inc.*, 701 So. 2d 646, 647 (Fla. 2d DCA 1997)).

110.     Plaintiff is a disabled individual because he has a record of, and actually has, disabilities including visual dyspraxia, dysgraphia, ADD, and a learning disability.   These disabilities affect major life activities including vision, depth perception, handwriting, the ability to manipulate objects, and the ability to focus.

111.     Plaintiff requested an accommodation for two short breaks in lieu of an hour-long lunch break.   Both of Plaintiffs short breaks never surpassed a total of forty-five minutes. (Defendants' employees receive an hour-long lunch break per working day).  Plaintiff requested a specialized spreadsheet from defendants.

112.     Plaintiff is a qualified individual because Plaintiff was fully capable of performing the essential functions of his job with accommodations.

113.     Defendants' Nelson admitted to Plaintiff that Defendant Sunshine Car Care was reluctant to hire Mr. Cotilla in the first place given his disabilities and accommodation needs.

20

Although Defendants initially granted Plaintiff's accommodation requests, Defendants rescinded them after Plaintiff complained about discrimination.

114.    Defendants are strictly and/or vicariously liable for violating the FCRA by discriminating against Plaintiff on the basis of his disability.  § 760.10(1)(a) Fla. Stat. (2020).

115.    Alternatively, Defendants are liable by proxy because Mr. Hafez, the Company's Co-founder, and one of its officers, Mr. Chambasian, the Company's President, facilitated the discrimination.

116.    As a result of Defendants' unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

### COUNT FIVE
*Disability Discrimination (Disparate Treatment)*
*in violation of the ADA*
**(Against all Defendants)**

117.    Plaintiff reincorporates the allegations in the preceding paragraphs.

118.    Defendants intentionally discriminated against Plaintiff by discharging Plaintiff because of his disability.

119.    Plaintiff is a disabled individual because he has a record of, and actually has, disabilities including visual dyspraxia, dysgraphia, ADD, and a learning disability.   These disabilities affect major life activities including vision, depth perception, handwriting, the ability to manipulate objects, and the ability to focus.

120.    Plaintiff was otherwise qualified to perform the essential functions of his job with reasonable accommodations because Defendants hired Plaintiff as "Quality Control Manager." Additionally, Defendants employed Plaintiff for over two years, and has no history of discipline for inadequate performance.

121.    Defendants discriminated against Plaintiff by wrongfully terminating him because of his disability.

122.    After subjecting Plaintiff to 6 months in an unrelenting hostile work environment, Defendants orchestrated a scheme to terminate Plaintiff under the guise of legitimate circumstances.

123.    On January 17, 2020, at 5 p.m., Defendants summoned Plaintiff to their office for a final meeting.  Defendants told Plaintiff his position—"Quality Control Manager"—was eliminated immediately.  As an alternative, Defendants offered Plaintiff the role as "Lube Technician," knowing full-well Plaintiff could never accept the job because of his disabilities.

124.    When Plaintiff told Mr. Hafez that he could not accept the position, Mr. Hafez insisted that Plaintiff take the weekend to think about it.  Even though Plaintiff gave his decision then—citing his dyspraxia and dysgraphia, and his poor vision, lack of depth perception, and inability to manipulate objects—Mr. Hafez told Plaintiff to report his decision to H.R.

125.    Ms. Analise from H.R. had a phone discussion with Plaintiff and his mother who both pleaded that Plaintiff could not be a "Lube Technician" because of his disabilities and the fact that he could not possibly work in an environment breathing in fumes throughout a shift—not to mention getting in and out from under cars, learning a plethora of new material on oil changes, and being able to meet the strenuous task of performing "the Fastest Oil Change on the Planet."

126.    Once Ms. Analise elicited a resignation, told Plaintiff his insurance would end immediately—rather than the end of the month—she hung up immediately.

127.    Accordingly, Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination.

128.    As a result of Defendants' unlawful employment practices in violation of the ADA,

Plaintiff has suffered damages.

### COUNT SIX
*Disability Discrimination (Disparate Treatment)*
*In violation of the FCRA*
**(Against all Defendants)**

129.    Plaintiff reincorporates the allegations in the previous paragraphs.

130.    The FCRA prohibits employers from discharging or otherwise discriminating

against an individual's terms and conditions of employment because his handicap.[3] §760.10(1)(a)

Fla. Stat. (2020); *see also Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 925 (Fla. 4th DCA 2007).

131.    Defendants intentionally discriminated against Plaintiff by discharging Plaintiff

because of his disability.

132.    Plaintiff is a disabled individual because he has a record of, and actually has,

disabilities including visual dyspraxia, dysgraphia, ADD, and a learning disability.   These

disabilities affect major life activities including vision, depth perception, handwriting, the ability

to manipulate objects, and the ability to focus.

133.    Plaintiff was otherwise qualified to perform the essential functions of his job with

reasonable accommodations because Defendants hired Plaintiff as "Quality Control Manager."

Additionally, Defendants employed Plaintiff for over two years, and has no history of discipline

for inadequate performance.

134.    Defendants discriminated against Plaintiff by wrongfully terminating him because

of his disability.

---

[3] While the FCRA does not define "handicap," Florida courts have interpreted the FCRA to proscribe "handicap" discrimination just as "disability" under the ADA.  *Ross v. Jim Adams Ford, Inc.*, 871 So. 2d 312, 314 (Fla. 2d DCA 2006).

135.    After subjecting Plaintiff to 6 months in an unrelenting hostile work environment, Defendants orchestrated a scheme to terminate Plaintiff under the guise of legitimate circumstances.

136.    On January 17, 2020, at 5 p.m., Defendants summoned Plaintiff to their office for a final meeting.  Defendants told Plaintiff his position—"Quality Control Manager"—was eliminated immediately.  As an alternative, Defendants offered Plaintiff the role as "Lube Technician," knowing full-well Plaintiff could never accept the job because of his disabilities.

137.    When Plaintiff told Mr. Hafez that he could not accept the position, Mr. Hafez insisted that Plaintiff take the weekend to think about it.  Even though Plaintiff gave his decision then—citing his dyspraxia and dysgraphia, and his poor vision, lack of depth perception, and inability to manipulate objects—Mr. Hafez told Plaintiff to report his decision to H.R.

138.    Ms. Analise from H.R. had a phone discussion with Plaintiff and his mother who both pleaded that Plaintiff could not be a "Lube Technician" because of his disabilities and the fact that he could not possibly work in an environment breathing in fumes throughout a shift—not to mention getting in and out from under cars, learning a plethora of new material on oil changes, and being able to meet the strenuous task of performing "the Fastest Oil Change on the Planet."

139.    Once Ms. Analise elicited a resignation, told Plaintiff his insurance would end immediately—rather than the end of the month—she hung up immediately.

140.    Accordingly, Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination.

141.    As a result of Defendants' unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

**COUNT SEVEN**
***Retaliation in Violation of the ADA 42 U.S.C. § 12203(a)***

**(Against all Defendants)**

142. Plaintiff reincorporates the allegations in the previous paragraphs.

143. The ADA prohibits employment discrimination against an individual for opposing or complaining about unlawful disability discrimination. 42 U.S.C. § 12203(a).

144. Plaintiff opposed Mr. Nelson's discriminatory treatment by telling Mr. Nelson to stop making discriminatory comments to him.

145. Plaintiff also complained to Ms. Barfield about Mr. Nelson's discriminatory treatment.

146. Following Plaintiff's opposition to Mr. Nelson and his complaint to Ms. Barfield, Mr. Nelson's hostility increased dramatically. Mr. Nelson went from warning Plaintiff that if something were to happen to Mr. Nelson's job

147. Mr. Nelson rescinded Plaintiff's disability accommodations. Additionally, Defendants wrongfully terminated Plaintiff following his discrimination complaints. Any reasonable person in Plaintiff's position would be dissuaded from complaining about ongoing harassment if he knew that such action would result in more, not less harassment, including termination.

148. Plaintiff's opposition to Mr. Nelson's discriminatory treatment and Mr. Nelson's subsequent rescission of Plaintiff's accommodations are causally connected because Mr. Nelson rescinded Plaintiff's accommodations after Plaintiff complained about Nelson's discriminatory treatment. Further, Mr. Nelson increased his hostility toward Plaintiff after Plaintiff complained about Mr. Nelson's mistreatment.

149. Defendants are strictly and/or vicariously liable for retaliating against Plaintiff for complaining about unlawful disability discrimination.

150.    As a result of Defendants' unlawful employment practices in violation of the ADA, Plaintiff has suffered damages.

### COUNT EIGHT
### *Retaliation in violation of the FCRA § 760.10(7)*
### (Against all Defendants)

151.    Plaintiff reincorporates the allegations in the previous paragraphs.

152.    The FCRA prohibits discrimination against an individual for opposing unlawful acts under the FCRA or for opposing or complaining about disability discrimination.  § 760.10(7), Fla. Stat. (2020).

153.    Plaintiff requested multiple accommodations to ameliorate the adverse effects of his disabilities.   Additionally, Additionally, Plaintiff opposed Mr. Nelson's discriminatory treatment.  Plaintiff told Mr. Nelson to stop making discriminatory comments regarding Plaintiff's disabilities.   Mr. Cotilla engaged in protected activity for a third time by complaining to Ms. Barfield about Mr. Nelson's mistreatment.

154.    Defendants took materially adverse actions against Plaintiff by rescinding his disability accommodations after complaining about discrimination. Additionally, Defendants wrongfully terminated Plaintiff following his discrimination complaints.  Any reasonable person in Plaintiff's position would be dissuaded from complaining about ongoing harassment if he knew that such action would result in more, not less harassment.

155.    Plaintiff's opposition to Mr. Nelson's discriminatory treatment and Mr. Nelson's subsequent rescission of Plaintiff's accommodations are connected because Mr. Nelson rescinded Plaintiff's accommodations after Plaintiff complained about Nelson's discriminatory treatment. Further, Mr. Nelson increased his hostility toward Plaintiff after Plaintiff complained about Mr.

Nelson's mistreatment.  This follows Mr. Nelson's "warning" to Plaintiff that should anything happen to Mr. Nelson's employment, Plaintiff would also suffer consequences.

156.    Accordingly, Defendants retaliated against Plaintiff for opposing unlawful employment practices.

157.    As a result of Defendants willful violation of the FCRA, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount to be determined at the time of trial, plus interests, including but not limited to all emotional distress and economic damages, punitive damages, liquidated damages, attorney's fees, costs, disbursements of action; and for such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable before a jury.

Dated: Miami, Florida
      March 31, 2021                     Respectfully submitted,

                                        **DEREK SMITH LAW GROUP, PLLC**

                                        Caroline H. Miller, Esq.
                                        701 Brickell Ave., Suite 1310
                                        Miami, Florida 33131
                                        P: (305) 946-1884
                                        caroline@dereksmithlaw.com
                                        *Attorneys for Plaintiff Asher Cotilla*